Karsten Oliva
75-5660 Kopiko St.
Ste C-7 #535
Kailua-Kona, HI 96740
lifeguardtower@yahoo.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Nov 24, 2023, 9:08 am
Lucy H.Carrillo, Clerk of Court

# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF HAWAI'I

| | |
|---|---|
| KARSTEN OLIVA, ) | CIVIL NO. **CV 23-00477 DKW-KJM** |
| ) | |
| ) | **COMPLAINT FOR DISCRIMINATION BASED** |
| Plaintiff, ) | **ON NATIONAL ORIGIN AND AGE;** |
| ) | |
| ) | RETALIATION; |
| vs. ) | |
| ) | VIOLATIONS OF TITLE 18 |
| ) | SECTION 241 & SECTION 242; |
| COUNTY OF HAWAI'I ) | |
| DEPARTMENT OF PARKS & ) | DEFAMATION; |
| RECREATION; MAURICE MESSINA; ) | |
| MITCH ROTH; LEE LORD; ) | |
| VICTOR MCDANIEL; ) | |
| ) | **DEMAND FOR A JURY TRIAL.** |
| Defendants. ) | |
| ) | |

## COMPLAINT

Defendant COUNTY OF HAWAII, DEPARTMENT OF PARKS & RECREATION ("Parks-H"), its director Defendant MAURICE MESSINA ("Messina") repeatedly denied Plaintiff KARSTEN OLIVA ("Karsten") employment as a lifeguard. Karsten was discriminated against on the basis of his National Origin in violation of Title VII of the Civil Rights Act of 1964 as amended, and because of his Age (over 40 y/o), in violation of the Age Discrimination in Employment Act of 1967, as amended. Upon exercising his right to complain about this discrimination, Karsten was retaliated against multiple times, had his good character defamed, and had his rights under Title 18 Section 241 & Section 242 violated. Defendant Messina acted in collusion with Defendant MITCH ROTH ("Mayor Roth"), Defendant LEE LORD ("Lord"), Defendant VICTOR MCDANIEL ("McDaniel").

## PARTIES

1.   At all times relevant hereto, Plaintiff KARSTEN OLIVA (hereinafter "Karsten") is a 53-year old resident of Kailua-Kona, Hawai'i. Karsten is a white male of German and American-Italian National Origin. Karsten was born in the United States, grew up in Germany, before returning to the United States as a

teenager. Karsten is a citizen of both the United States and Germany. Karsten speaks fluent English with a German accent.

2.  At all times relevant hereto, Defendant COUNTY OF HAWAI'I DEPARTMENT OF PARKS & RECREATION (hereinafter "Parks-H"), was and is a governmental entity, authorized to do business in the County of Hawai'i, State of Hawai'i.

3.  At all times relevant hereto, Defendant MAURICE MESSINA (hereinafter, "Messina"), was and/or is a resident of the County of Hawai'i, State of Hawai'i. Messina was and is an employee representative, and/or agent of Defendant Parks-H, was hired and employed by Defendant Parks-H, was acting in the capacity of the director of Defendant Parks-H, was acting within the course and scope of such employment and/or agency for, and/or with the apparent authority of, Defendant Parks-H.

4.  At all times relevant hereto, Defendant MITCH ROTH (hereinafter 'Mayor Roth") was and/or is a resident of the County of Hawaii, State of Hawaii, was and is the Mayor of the County of Hawai'i.

5.  At all times relevant hereto, Defendant LEE LORD (hereinafter 'Lord") was and/or is a resident of the County of Hawai'i, State of Hawaii, was and is the Managing Director of the County of Hawai'i.

6.  At all times relevant hereto, Defendant VICTOR MCDANIEL (hereinafter, "McDaniel"), was and/or is a resident of the County of Hawai'i, State

of Hawai'i. McDaniel was and is an employee, representative, and/or agent of Defendant Park-H, was hired and employed by Defendant Parks-H, was acting in the capacity of the Kona District Supervisor of Defendant Parks-H, was acting within the course and scope of such employment and/or agency for, and/or with the apparent authority of, Defendant Parks-H.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction  pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 and the Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634. Plaintiff was issued a Notice of Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC"), which Plaintiff received on September 1, 2023. A true and correct copy of that Notice is attached as **Exhibit 1.**  60 days or more have elapsed since Plaintiff filed a charge of age discrimination with the EEOC. Venue is proper under 28 U.S.C. § 1391 because all of the conduct complained of occurred within this District.

## INTRODUCTION

8.  After witnessing his father losing a battle with cancer on Memorial Day, in May of 2019, Karsten was looking for ways to restore normalcy to life and begin  healing the emotional toll this experience had taken.

4

9.   Karsten felt that working as a lifeguard, a position that he was highly qualified for, would provide him with a much-needed change in the daily routine, having been his elderly father's caregiver.

10.   Karsten, had previously been certified as a lifeguard while attending college in California.

11.   Karsten never anticipated that pursuing his modest goal of getting certified again and seeking employment as lifeguard would end up becoming the basis of a federal lawsuit, because of what a deceptive and hostile environment KCAC would reveal itself to be.

12.   Prior to the events that give rise to this complaint, Karsten had been a regular swimmer at KCAC for 18 years. Over those years, Karsten swam approximately 12.6 Million yards at KCAC. 12.6 Million yards is equivalent to 7,159 miles. In comparison, the distance from Kailua-Kona, Hawai'i to Frankfurt, Germany is 7,522 miles.

13.   During these 18 years, there was never any drama surrounding Karsten being at the pool. Karsten always swam peacefully and no one ever had problem with Karsten, or accused Karsten of acting in anything other than a gentlemanly manner.   Often times, Karsten was accompanied by his elderly father. Karsten's father would sit in the shade waiting to go on walks with his son, after Karsten was done swimming.

14.   Over many years of being a championship level swimmer in Germany, and later in high school and college here in the United States, Karsten had gained an appreciation and knowledge of what elements are required to maintain a well functioning and safe pool environment.

15.   The things Karsten observed at KCAC concerned him.  Being funded by the residents of Hawai'i Island, this public recreation resource was unfortunately being used and abused by Parks-H insiders to serve up jobs for friends and family irrespective of their actual merits to be lifeguards. The fact that younger age and being perceived as more local were used as hiring criteria was reckless and unnecessarily placed pool patrons at risk.

16.   Karsten never anticipated that those in County of Hawai'i leadership positions would end up abusing their power and influence to weaponize the Hawaii Police Department against him, because Karsten was viewed as a whistleblower who needed to be punished for speaking up about the prevailing discrimination he had encountered.

## STATEMENT OF MATERIAL FACT

17.  In August 2019, Karsten began inquiring about lifeguard certifications at KCAC. While Karsten was being told that the County was not offering any lifeguard certifications at that time, it was just days earlier that Breyden McDaniel,

the son of Defendant Victor McDaniel, was certified and later hired as a lifeguard by Parks-H.

18.  Breyden received this preferential treatment over Karsten, because Breyden was much younger, did not speak with Karsten's german accent, was perceived as more "local" than Karsten, and because Breyden's father occupied a supervisory position at Parks-H.

19.  Over the months that followed, Karsten was given various  excuses as to why no certifications were being offered. Karsten was told to keep his skills fresh and that he would be notified of upcoming opportunities. In November of 2019, KCAC staff were being re-certified. There would have been room for Karsten to participate. However, Karsten did not receive an invite.

20.  A litany of excuses continued into 2020. In March, the pool closed due to the start of the global COVID pandemic. The pool then reopened with pandemic precautions in July of 2020. It was at this time that Karsten saw a listing at the county job web site advertising a lifeguard vacancy for KCAC.

21.  Karsten immediately completed the American Red Cross online blended learning class for lifeguard training and applied for that position on August 7, 2020 (Recruitment Number 2020-00069).

22.  Instead of providing Karsten with an opportunity to complete the required in-water sessions at KCAC, in a timely fashion, Karsten was purposely and repeatedly delayed until September 14, 2020.

23. After additional delays, Karsten was finally allowed to complete his certification on September 24, 2020. However the record that Karsten had completed his certification was never transmitted to the American Red Cross, in a timely fashion.

24. Digital certificates were to be downloadable within 72 hours of completion. Karsten should have been able to access his certificate by Monday, September 28, 2020, at the latest. However, Karsten was not able to download his certificate until October 13, 2020.

25. This was done to sabotage Karsten's ability to submit his certificate to the Department of of Human Resources.

26. As Karsten later discovered, all these delay tactics were orchestrated in order to sideline him so that Kahanu Delovio, the fiancée of yet another son of Defendant McDaniel, could advance through the hiring process without having to compete with Karsten.

27. Kahanu, had her certification done quickly, was hired quickly, and started working at KCAC shortly thereafter. Just like her brother-in-law Breyden, Kahanu received this preferential treatment over Karsten, because she was much younger than Karsten, did not speak with Karsten's german accent, was perceived as more "local" than Karsten, and because her fiancé's father occupied a supervisory position at Parks-H.

28. As soon as Karsten began complaining about being sidelined in this fashion, a sequence of three (3) retaliations was triggered against him.

### Retaliation #*1*

29. On November 18, 2020, a frivolous 911 was made about Karsten. Police body cam's captured Defendant McDaniel greeting and leading the responding officers to the pool office.  The intent was to have Karsten, who was not at the pool at that time, trespassed the next time he came in to swim.

30. The pretense was that Karsten was taking photos in the pool parking lot. However, given that photography in public falls under constitutionally protected activity, this trespass attempt failed.

31.  Karsten returned to the pool the following Monday and all intent to trespass Karsten had mysteriously vanished. Karsten, who just days earlier was described to police as being a big trouble maker at the pool, accused of yelling racial slurs at the staff, and was accused of speeding recklessly through the pool parking lot, was all of a sudden no longer perceived as a menace.

32. On December 27, 2020, Karsten emailed Defendant Mayor Roth about the discrimination that he experienced while trying to gain employment as a lifeguard at KCAC.

33. Defendant Mayor Roth responded that he would forward Karsten's concerns to Defendant Messina and Defendant Lord.

34. Neither Defendant Messina, nor Defendant Lord, offered any redress to Karsten's grievance.

35. Karsten emailed the Mayor a second time but Mayor Roth never responded.

36. Neither Defendant Mayor Roth, Defendant Messina or Defendant Lord did anything to de-escalate Karsten's growing frustration of being mistreated in this manner. Defendant Lord later had the audacity to issue Karsten an ultimatum. Karsten was told to stop being negative or his emails would be blocked for harassment.

37. Karsten continued to exercise his right to complain about the County's dismal failure to rectify its unfair and deceptive hiring practices, which had already been exposed extensively in Legislative Auditor Bonnie Nims' Knighton Award winning audit. The County did not like that Karsten continued to exercise his right to complain.

**Retaliation #2**

38. On July 30, 2021, and 8.5 months of no drama since the first retaliation in November 2020, Karsten was waiting in the line to enter the pool for the 9:00 AM lap swimming session, when Senior Lifeguard Derek Simmons came charging out of the pool gate barking orders that everyone needed to wear masks and stand next to cones that were set up.

39.  Simmons, who was not wearing mask himself, was dressed in a Teenage Mutant Ninja Turtle t-shirt instead of a proper lifeguard uniform.

40.  Karsten quietly pointed out that the outdoor mask requirement had been lifted by Governor Ige and that the cones, that Simmons demanded patrons to stand next to, were not spaced far enough apart to comply with the social distancing rules, which were still in effect.

41. Karsten also reminded Simmons that it was against the posted COVID rules that Simmons repeatedly had allowed spectators to sit in the bleachers. Simmons then denied Karsten entrance to the pool and stated he would call the police.

42. Karsten quietly left as Simmons began arguing with another pool patron who voiced her concerns over how Karsten was being treated. She later described Simmons' behavior as unhinged.

43. Police body cam video shows the pool custodian fixing the improper cone spacing as the responding officer arrived at the scene.

44. Karsten being denied access to a public facility, for doing nothing more than voicing concerns that were matters of public health and safety during a global pandemic, constituted an abuse of authority.

**Retaliation #3**

45. Karsten returned to the pool on Wednesday August 4, 2021. Karsten approached the sign-in desk and asked if he may enter. Karsten was told yes, had his body temperature taken, was signed in.

46. After showering in accordance with the posted pool rules, Karsten went to his assigned lane and began swimming.

47. Approximately 20 minutes into swimming peacefully, Karsten had five (5) police officers weaponized against him.

48. Karsten was ordered to exit the water.

49. Karsten was then threatened with arrest if he did not leave the pool or if he were to return within less than ONE (1) YEAR.

50. When Karsten respectfully asked what crime he had committed, the police officers told Karsten that he had not committed any crime, that Karsten was **simply no longer welcome at the pool**.

51. Standing on the pool deck, dressed in just his Speedos, and being surrounded by five (5) armed police officers, Karsten felt intimidated and threatened for  being ganged up upon in this manner during his tranquil morning swim.

52. Karsten was handed a printout of the unlawful trespass notice, which he then signed under duress.

53.  As Karsten was walking out, police body cam captured one of the police officers making the remark "There is something wrong with that bruddah."

54. The plan to ambush Karsten, while he was peacefully swimming, was later revealed to be a coordinated and pre-authorized event with blessings by Defendant Messina.

55. That this event was a premeditated setup against Karsten, is clearly evidenced by the fact that not one of the five (5) police officers took a single witness statement from the other swimmers. There were multiple pool regulars in attendance who could have attested to the fact that Karsten did not engage in any of the conduct that he was viciously and falsely accused of.

56.  The unlawful trespass warning contained false allegations that Karsten was harassing pool patrons, harassing pool staff, and that he was not following COVID protocols that were in place at that time. The most asinine allegation was that Karsten came to the pool to splash the lifeguards and pool patrons from across the entire distance of what is a 50 Meter olympic size pool.

57.  As a result Karsten filed a complaint against Defendant Messina with the County Ethics Board.

58. The Ethics Board gave Defendant Messina carte blanche to further defame Karsten with multiple false and outrageous accusations, including that Karsten had been stalking all KCAC employees home after work.

59. Defendant Messina was never once required to provide proof of these vile and despicable assassinations of Karsten's good character.

60. On September 18, 2022, Karsten, saw another lifeguard vacancy listed at the county job web site (Recruitment Number 2022-00127).

61. Karsten submitted an application but did not receive a response.

62. As was later revealed on police body cam, Karsten was in fact blacklisted. A copy of this police body cam video is attached as **Exhibit 2.**

63. On March 12, 2023, Karsten saw a listing for four (4) lifeguard vacancies. Karsten applied for all four (recruitment numbers: 2023-0027, 2023-00166, 2023-00130,  2023-00167).

64. On June 1, 2023, the County conducted a lifeguard assessment where Karsten demonstrated his extensive skills.

65.  Karsten was the only candidate at the assessment.

66.  The County did the assessment without any actual intention of hiring Karsten.

67. Karsten's assessment at the pool, as well as an interview at the West Hawai'i Civic Center on June 13, 2023 were orchestrated for appearances sake only, so later these could be used as some sort of  "proof" that the Karsten was not blacklisted, given that he had been invited to be assessed and interviewed

68.  This was nothing more than the County of Hawai'i trying to create the illusion of a level playing field. Equal Opportunity theatrics performed by a bunch of bad actors who only want to hire their own kind.

69.  On June 30, 2023, despite having demonstrated extensive merit, Karsten received 4 rejection letters. According to statements by Parks-H Deputy Director Michelle Hiraishi, the final hiring decisions rested in the hands of Defendant Messina.

70.  Defendant Messina had motive to retaliate against Karsten, because Karsten had filed a complaint against Messina with the Ethics Board.

71.  Furthermore, Defendant Messina had motive to retaliate against Karsten, because Karsten had sent critical emails.

72.  Karsten then filed an Open Records Request under the provisions of the Uniform Information Practices Act (UIPA), in order ascertain if there were other applicants that he was not aware of. It was Karsten's goal to obtain comparative demographics data, as well as a list of metrics by which the other applicants would have had to outperform him in order to justify the four (4) rejections that he had received.

73.  The Open Records Request revealed that there were no other applicants.

74.  Shortly after Karsten communicated that he would be seeking help from the U.S. Equal Employment Opportunity Commission ("EEOC") in these matters,

Karsten received a letter from Defendant Messina accusing Karsten of intervening with the assessments of other lifeguard candidates.

75.  Again, the Open Records Request had revealed that there were no other applicants.

## COUNT I

### Discrimination and Retaliation on the Basis of National Origin

76. Karsten realleges the foregoing paragraphs as though fully set forth herein.

77. Karsten is a member of a protected class on the basis of his National Origin.

78. Karsten, in all respects, was and is fully qualified and certified to perform the duties of a lifeguard in a manner above and beyond Parks-H's expectations.

79. Parks-H discriminated against Karsten as described above, including but not limited to intimidating him, subjecting him to a hostile public recreation environment, denying him of a fair hiring process and employment. Parks-H also retaliated against Karsten as described above.

80. Parks-H actions were taken with a willful and wanton disregard of Karsten's rights under Title VII of the Civil Rights Act.

81.  As a direct and proximate result of said unlawful employment practices and in disregard of Karsten's rights and sensibilities, Karsten has suffered

humiliation, degradation, emotional distress, other consequential damages, and lost wages.

## COUNT II

### Discrimination and Retaliation on the Basis of Age

82. Karsten realleges the foregoing paragraphs as though fully set forth herein.

83. Karsten is a member of a protected class on the basis of his Age.

84. Karsten, in all respects, was and is fully qualified and certified to perform the duties of a lifeguard in a manner above and beyond Parks-H's expectations.

85. Parks-H repeatedly discriminated against Karsten as described above, including but not limited to intimidating him, subjecting him to a hostile public recreation environment, denying him of a fair hiring process and employment.

86. Parks-H also retaliated against Karsten as described above. Parks-H's actions were taken with a willful and wanton disregard of Karsten's rights under the Age Discrimination in Employment Act.

87. As a direct and proximate result of said unlawful employment practices and in disregard of Karsten's rights and sensibilities, Karsten has suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

## COUNT III

### Violations under Title 18 Section 241

88.   Karsten realleges the foregoing paragraphs as though fully set forth herein.

89.   Karsten has the absolute right to be free of two or more persons from conspiring to injure, oppress, threaten, or intimidate him in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same.

90.   Parks-H actions were taken with a willful and wanton disregard of Karsten's rights under Title 18 Section 241.

91.   As a direct and proximate result of said unlawful actions and in disregard of Karsten's rights and sensibilities, Karsten has suffered humiliation, degradation, emotional distress, as well as other consequential damages.

## COUNT IV

### Violations under Title 18 Section 242

92.   Karsten realleges the foregoing paragraphs as though fully set forth herein.

93.   Karsten has the absolute right to be free from another person or persons to act under color of any law to willfully deprive him of a right or privilege

protected by the Constitution or laws of the United States. For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties.

94.   Parks-H actions were taken with a willful and wanton disregard of Karsten's rights under Title 18 Section 242.

95.   As a direct and proximate result of said unlawful actions and in disregard of Karsten's rights and sensibilities, Karsten has suffered humiliation, degradation, emotional distress, other consequential damages.

## COUNT V

### Failure to supervise

96.   Karsten realleges the foregoing paragraphs as though fully set forth herein.

97.   The repeated and grossly negligent failures by Defendant Mayor Roth and Defendant Lord to supervise Defendant Messina, who repeatedly and grossly negligently failed to supervise Defendant McDaniel and pool staff, are direct and proximate cause for Karsten to suffer humiliation, degradation, emotional distress, other consequential damages.

## COUNT VI

### Defamation

98.   Karsten realleges the foregoing paragraphs as though fully set forth herein.

99.   The many slanderous and libelous ways in which Karsten's good character was repeatedly defamed are a direct and proximate cause for Karsten suffering humiliation, degradation, emotional distress, other consequential damages.

## COUNT VII

### Blacklisting

100.   Karsten realleges the foregoing paragraphs as though fully set forth herein.

101.   For Defendant Parks-H, Defendant Messina, Defendant Mayor Roth, Defendant Lord, Defendant McDaniel and Aquatics Division staff to make, circulate, or cause to be circulated a blacklist is unlawful.

102.   Being blacklisted was and is an affront on Karsten's good character and caused him humiliation, degradation, emotional distress, lost wages, opportunity costs, other consequential damages.

## PRAYER FOR RELIEF

A.   An order directing that Defendant Parks-H hires Karsten for a full-time lifeguard position at KCAC, and will do so without further delay.

B.    An order directing that Karsten is to receive the $2,000 recruitment incentive that was published when Karsten had applied on March 12, 2023. Award Karsten any pre- and post-judgement interest for said recruitment incentive.

C.   Award Karsten compensatory damages in an amount equivalent to the annual incomes Karsten would have earned from full-time employment as a lifeguard since the Fall 2019. Including any and all opportunity cost Karsten has suffered since and will continue to suffer into the future. After two (2) years of work experience as a county lifeguard, Karsten would have, by now, acquired eligibility for becoming a senior level lifeguard, which would have meant an increase in income potential.

D.   Award Karsten compensatory damages in an amount to be determined by the jury in order to compensate Karsten for the slanderous remarks Defendant Messina made about Karsten at two (2) public meetings before the County Ethics

Board.  As well as the libelous statements Defendant Messina made about Karsten in written communications to the Board.

E.    Award Karsten compensatory damages in an amount to be determined by the jury to compensate him for every 9:00 AM lap swimming session that Karsten was deprived access to. At four (4) sessions per week for 52 weeks, this is a tally of 208 such denials. No longer having access to KCAC, violated the Karsten's liberty and freedom of movement rights under the Constitution. Karsten suffered emotional distress, mental anguish, humiliation, and loss of reputation due to this abuse of authority. Furthermore, Karsten was only able to swim 3 times per week at the Konawaena pool, instead of the 4 times per week that he would have been able swim at KCAC. This forced upon Karsten a 25 percent reduction of pool days available to him and therewith destroyed his training goals for an entire year.

F.    Award Karsten compensatory damages for the intentional infliction of emotional distress.

G.    Award Karsten punitive damages in the maximum allowable amount by law, in order to deter the Defendants from engaging in such outrageous conduct in the future.

H.   Award Karsten both pre- and post-judgment interest.

I.   Award Karsten reasonable attorneys' fees and costs to the maximum extent allowed by law.

J.   Award Karsten any other relief the Court sees fit.

DATED: Kailua-Kona, Hawai'i, November 24, 2023

/S/ Karsten Oliva

_____

KARSTEN OLIVA

Pro Se litigant

# Exhibit 1

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Honolulu Local Office**
300 Ala Moana Blvd, Room 4-257
Honolulu, HI 96850
(808) 800-2350
Website:  www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 08/31/2023

**To:** Mr. Karsten Oliva
75-5660 KOPIKO STREET STE C7 #535
KAILUA KONA, HI 96740
Charge No: 486-2023-00514

EEOC Representative and email:     KRIS KAOPUIKI
Investigator
KRIS.KAOPUIKI@EEOC.GOV

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 486-2023-00514.

On behalf of the Commission,

Digitally Signed By:Christine Park-Gonzalez
08/31/2023

Christine Park-Gonzalez
District Director

## Exhibit 2

**Police Body Cam Video
containing a statement that Plaintiff Karsten Oliva
was blacklisted**