IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

KARSTEN OLIVA,

        Plaintiff,

    vs.

COUNTY OF HAWAI'I
DEPARTMENT OF PARKS &
RECREATION, *et al.*,

        Defendants.

Case No. 23-cv-00477-DKW-KJM

**ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

In 2020, Plaintiff Karsten Oliva, a dual American/German national over the age of 40, unsuccessfully applied for a position as a pool lifeguard at the Kona Community Aquatic Center ("KCAC")—a facility operated and managed by the County of Hawai'i, Department of Parks & Recreation ("Parks Department"). Believing that his non-selection was due to nepotism and other hiring irregularities, Oliva subsequently began a prolonged campaign of harassing County and Parks Department employees, including its Director Maurice Messina, then-Mayor Mitch Roth, Managing Director Lee Lord, and KCAC Recreation Director Victor McDaniel through a barrage of disparaging and abusive emails and in-person interactions. In 2023, Oliva again applied for a KCAC lifeguard position. Perhaps unsurprisingly, despite being the only applicant for the position, Oliva was once again rejected—this time, due to his demonstrated inability to treat not only the

public, but his prospective supervisors and colleagues, with respect, professionalism, and civility.

Unsatisfied with that seemingly common-sense result, Oliva filed the instant lawsuit, alleging that the Parks Department's refusal to hire him constituted unlawful discrimination and retaliation on the basis of national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* In addition, Oliva asserted claims against the Parks Department, Messina, Roth, Lord, and McDaniel for criminal conspiracy pursuant to 18 U.S.C. §§ 241 & 242, failure to supervise, defamation, and blacklisting.

Oliva's claims each fail for procedural and/or substantive reasons, including that he failed to provide the requisite notice for his state law tort claims, failed to exhaust parts of his Title VII and ADEA claims, lacks standing to bring criminal claims, and entirely ignores the single *glaring* reason his 2023 application was rejected—*i.e.*, that he has spent years engaged in a near-constant crusade to harass those with whom he now seeks to work. As a result, for the reasons more fully set forth below, Defendants Parks Department, Messina, Roth, Lee, and McDaniel's motion for summary judgment, Dkt. No. 77, is GRANTED.

## <u>FACTUAL & PROCEDURAL BACKGROUND</u>[1]

In 2020, Plaintiff Karsten Oliva—a dual German/American national over the age of 40—applied for, but did not receive, a position with the County of Hawaiʻi, Department of Parks and Recreation as a pool lifeguard for the Kona Community Aquatic Center. Compl. at ¶ 1, Dkt. No. 1; Opp. Ex. 6, Dkt. No. 83-6; DCSF Ex. 2 at 2, Dkt. No. 78-5.[2] Shortly after finding out that he had not been selected, Oliva sent an email[34] to then-Mayor Mitch Roth, claiming that the hiring process had

---

[1]The facts are taken from Defendants' concise statement of facts ("DCSF"), Dkt. No. 78, Oliva's response to Defendants' concise statement of facts ("RCSF"), Dkt. No. 84, and the exhibits filed in support of the DCSF. In addition, although the Local Rules generally provide that a party bringing or opposing a motion for summary judgment may attach exhibits only to his or her concise statement of facts, because Oliva is *pro se*, the Court liberally construes his filings and also considers the exhibits filed in support of Oliva's memorandum in opposition ("Opp."), Dkt. No. 83. *See* L.R. 56.1(h); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[2]In citing to the parties' exhibits, the Court utilizes the page numbers assigned by CM/ECF in the top right corner of each page, rather than the page numbers at the bottom of each page, because the latter does not extend consistently throughout each document.

[3]Oliva broadly objects that the Court cannot consider the emails offered by Defendants because they lack proper authentication under Federal Rule of Evidence 901. *See* Opp. at 12; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). According to Oliva, "County Defendants have failed to provide sufficient proof that the emails are genuine" because "(1) The emails lack accompanying metadata or other technical data verifying their origin; (2) County Defendants did not provided [sic] testimony from any sender, recipient, or custodian of the emails confirming their authenticity; [and] (3) The email content contains inconsistencies such as formatting errors, scaling issue [sic], as well as unexplained gaps that call into question its reliability." Opp. at 12. However, not only has Oliva admitted to receiving or sending many of these emails, but each email chain attached to the DCSF has been attested to by Director Messina—someone with personal knowledge of such emails. *See* Fed. R. Evid. 901(b)(1); *see generally* RCSF; Decl. of Maurice Messina, Dkt. No. 78-1. As such, the Court does not find the emails to be inadmissible, as suggested by Oliva.

[4]Oliva also argues that all emails offered by Defendants are inadmissible because they "are incomplete and lack crucial context. Specifically: (1) The motion includes only selected portions of email chains, omitting preceding or subsequent communications that may alter their meaning; [and] (2) The content of the emails is ambiguous, and their interpretation requires consideration of external evidence, such as testimony, which has not been provided." *See* Opp. at 12. Oliva

- 3 -

been riddled with irregularities including, *inter alia*, the delay of his lifeguard certification so that Kahanu Delovio—KCAC Recreation Director Victor McDaniel's son's fiancée—could be hired without competition. *See* DCSF at ¶ 1; RCSF at ¶ 1; DCSF Ex. 2; DCSF Ex. 29 at 2, Dkt. No. 78-32. Roth referred the matter to Maurice Messina, the Director of the Department of Parks and Recreation. DCSF at ¶ 2; RCSF at ¶ 2; DCSF Ex. 2 at 1. On February 1, 2021, following his inquiry, Messina reported to Oliva that he had not found any irregularities in the hiring decision. DCSF at ¶ 5; RCSF at ¶ 5; DCSF Ex. 4 at 2, Dkt. No. 78-7. Unsatisfied with that response, Oliva replied by asking Messina, "why don't you start looking with a little more veracity" and sending a link to an article regarding an audit of the County's hiring practices. DCSF at ¶ 5; RCSF at ¶ 5; DCSF Ex. 4 at 3.

That marked the beginning of a years-long campaign by Oliva of harassing Parks Department and County employees. On February 3, 2021, two days after his initial response, Oliva sent Messina another email which claimed that "[a]t KCAC mediocrity [loves] company" and criticized a misspelled KCAC sign as "Pathetic!" DCSF at ¶ 6; RCSF at ¶ 6; DCSF Ex. 5 at 1–2, Dkt. No. 78-8. A month later, on

---

fails, however, to provide *any* explanation of what context might be missing or how further clarifying testimony would alter the Court's understanding of the emails. *See id.* As a result, the Court does not find that the emails are inadmissible on these bases either. *See* Fed. R. Evid. 106 & 403.

March 12, 2021, Oliva sent another email, which he later forwarded to Roth, Messina, and Parks Department Managing Director Lee Lord, criticizing the way Delovio wore her face mask in a photo, and inquiring whether nepotism was responsible for her hiring.  DCSF at ¶ 7; RCSF at ¶ 7; DCSF Ex. 6 at 1, Dkt. No. 78-9.  That same day, Messina received a report from KCAC pool lifeguard Ashlynn Kaiamakini that she had had an unsettling contact with Oliva the previous afternoon in a Walmart parking lot, where he made eye contact with her, drove in her direction, passed slowly in front of her parked vehicle, made eye contact again, and then sped off.[5]  DCSF at ¶ 8; DCSF Ex. 41 at 1, Dkt. No. 78-44.

On May 30, 2021, Oliva sent yet another email to Roth, Lord, and Messina, in which he suggested that the Parks Department erect a statue of McDaniel "[l]ike Michaelangelo's [sic] David, but retaining the essence of Victor's smugness that the people's pool exists to serve up jobs for his family members without having to compete with outsiders like me."  DCSF at ¶ 9; RCSF at ¶ 9; DCSF Ex. 7 at 3, Dkt. No. 78-10.[6]  The email included a photo of the statue of David, which Oliva had

---

[5]Oliva objects to this report as inadmissible hearsay.  RCSF at ¶ 8.  However, the report is not hearsay because it is not offered for the truth of the matter asserted—that is, that Oliva actually engaged in those actions—but rather to show the effect on the listener: here, Messina.  *See* Fed. R. Evid. 801(c)(2).
[6]Oliva specifically objects to this email as incomplete and part of a larger set of communications.  RCSF at ¶ 9.  He does not deny, however, that he sent the email or provide any additional explanation that might contextualize his statements.  *See id.*  As such, the Court does not find it to be inadmissible on this basis.  *See* Fed. R. Evid. 106 & 403.

photoshopped to include McDaniel's face, together with the following

commentary:

> Too much hair?  Once the cruise ships return, a statute [sic] like this could become Kona's premiere [sic] attraction.  The County could even charge visitors a few bucks to bask in the presence of Victor's greatness.  Think about the revenues it could generate.  This could fund the remodeling of the locker rooms, showers, defunct solar water heating, etc.  You know all the things a pool (that recently hosted the Women's U.S. Olympic Water Polo Team) should have in full working order at all times.

DCSF Ex. 7 at 3–4.  Messina responded, asking Oliva to refrain from sending such

communications to County employees.  *Id.* at 2; DCSF at ¶ 10; RCSF at ¶ 10.

On June 6, 2021, Oliva continued his email campaign, reaching out to Roth,

Lord, and Messina with a graphic stating: "You can fool all ~~the people~~ average

swimmers some of the time, and some of the ~~people~~ weak swimmers all the time,

but you cannot fool all the ~~people all the time~~ fast swimmers @ any time. –

~~Abraham Lincoln~~ Unemployed Lifeguard."  DCSF at ¶ 11; RCSF at ¶ 11; DCSF

Ex. 8 at 3, Dkt. No. 78-11.  Lord responded, requesting once again that Oliva

refrain from sending derogatory communications and indicating that the Parks

Department considered his continuing emails to be harassment.  DCSF at ¶ 12;

RCSF at ¶ 12; DCSF Ex. 8 at 1.  Oliva responded, protesting the characterization

of his emails as derogatory or harassing, but nonetheless promised to refrain, as

requested.  DCSF Ex. 8 at 1.

On July 26, 2021, the Parks Department received a complaint from a KCAC patron that Oliva had been "staring/glaring" at him and his son continuously for the past month, asking other patrons and lifeguards about his son, attempting to splash other swimmers and lifeguards, and generally acting in an unsettling manner.[7] DCSF at ¶ 13; DCSF Ex. 9, Dkt. No. 78-12.  Consequently, the County issued a Notice of Trespass on August 4, 2021, prohibiting Oliva from entering KCAC for one year due to his alleged failure to follow COVID-19 protocols and harassment of employees and patrons.  DCSF at ¶ 14; RCSF at ¶ 14, DCSF Ex. 10, Dkt. No. 78-13.

On October 2, 2021, Oliva filed a Petition with the Hawaiʻi County Board of Ethics, claiming Messina had engaged in: "1. Failure to provide leadership with integrity.  2. Dereliction of duty to ensure fairness.  3. Obstruction of justice." DCSF at ¶ 15; RCSF at ¶ 15; DCSF Ex. 11 at 1–2, Dkt. No. 78-14.  Following a meeting on November 10, 2021,[8] at which both Oliva and Messina testified, the Board of Ethics issued an Informal Advisory Opinion on February 16, 2022, finding that Messina had not breached any of its rules.[9]  DCSF at ¶¶ 16–17; RCSF

---

[7]Oliva also claims this complaint is hearsay.  RCSF at ¶ 13.  However, as before, the complaint is not hearsay as it is offered for its effect on the listener, rather than for the truth of the matter asserted.  *See* Fed. R. Evid. 801(c)(2).

[8]Although the DCSF identifies the meeting as having taken place on November 11, 2021, this appears to be a clerical error, as minutes list the date as November 10, 2021.  *See* DCSF at ¶ 16; DCSF Ex. 12 at 1, Dkt. No. 78-15.

[9]Oliva partially admits and partially denies these statements of fact, claiming that the Board of Ethics' opinion was falsely based on Messina's "perjured" testimony.  *See* RCSF at ¶¶ 16–17.

at ¶¶ 16–17; DCSF Ex. 12; DCSF Ex. 13.

During this same time period, on October 5, 2021, Oliva sent an email to Messina, Lord, and Roth which sarcastically "congratulate[d] Parks and Recreation for the outstanding efforts being made under [Messina's] leadership to solve the Big Island's homeless problem," and remarked that it was "[h]eartwarming to see such Aloha being showered upon tweekers and other assorted riff raff, while I myself, as a lifeguard salary deprived and unjustly trespass noticed swimmer, unassumingly take up residence in a 4-door sedan without trashing my surroundings or otherwise make myself a visual plight to our lovely community."[10] DCSF at ¶ 18; DCSF Ex. 14 at 1, Dkt. No. 78-17. This was followed, on February 18, 2022, by yet another email to Messina and Alejandra Flores-Morikami, a Parks Department Aquatic Recreation Specialist, which suggested that the Parks Department deliberately chose not to have a "functional video surveillance system that could have exonerated" him as such system could also "capture imagery of a roly-poly lifeguard getting impregnated just a few month [sic] after getting the

---

The Court does not find, however, that there is a dispute of material fact in this regard as the Board of Ethics' decision was based not only on the parties' testimony, but also on corroborating evidence submitted by both sides. *See* DCSF Ex. 12 at 7–10; DCSF Ex. 13 at 3–5, Dkt. No. 78-16.

[10]Oliva specifically objects to this email and those subsequently referenced in DCSF exhibits 15, 17, and 19 as misleadingly incomplete. *See* RCSF at ¶¶ 18–20, 22. However, as already explained several times over, for each of these emails, he neither provides any further context, nor does he dispute that he sent the actual emails presented in the exhibits. *See supra* 3–4 n.4, 5–6 n.6. The Court therefore does not find them to be inadmissible on this basis. *See* Fed. R. Evid. 106 & 403.

job."  DCSF at ¶ 19; DCSF Ex. 15 at 1, Dkt. No. 78-18; Depo. of Karsten Oliva at 100:20–101:10, Dkt. No. 78-45.  Clarifying the lifeguard to which he referred, Oliva attached to his email a photo of Delovio, taken from her social media, as proof of "what entitlement looks like."  DCSF Ex. 15 at 1–2; Oliva Depo. at 103:3–11, 103:21–104:11.

On November 2, 2022, Oliva sent another email to Messina.  DCSF at ¶ 20; DCSF Ex. 17, Dkt. No. 78-20.  Therein, Oliva attached photos of a lifeguard's truck with purportedly worn tires, and asked Messina whether he had "an ounce of shame to be at the helm of this shitshow?"  Messina Decl. at ¶ 35; DCSF Ex. 17 at 3–4; Oliva Depo. at 105:16–106:15.  Oliva also took issue with Delovio's parking space, claiming that "[i]f the little Prima-Donna doesn't like waddling a few extra feet, maybe a red carpet will entice her" and attaching a photo of Delovio, taken once again from her social media.  DCSF Ex. 17 at 5–7; Oliva Depo. at 106:16–107:5.  Finally, Oliva included a graphic which stated: "My opinion offended you?  You should hear what I keep to myself," and remarked that his emails were written with "a yearning for fairness, transparency, accountability and a respect for my due process rights.  All of which you continue to deprive me of."  DCSF Ex. 17 at 9–10; Oliva Depo. at 107:6–20.

On January 23, 2023, Oliva emailed Messina again to inquire about the Parks Department's posted lifeguard vacancies.  DCSF at ¶ 22; DCSF Ex. 19 at 1,

Dkt. No. 78-22.  In doing so, Oliva addressed Messina as "Your Majesty, Exalted Ruler of The Kingdom of Parks & Recreation" and asked whether "actual merit in the water and a degree from the University of California, and AARP eligible age" are "still disqualifying factors" or whether there were "unpublished requirements" such as "preference once again [] given to young roly-polly [sic] females who fornicate with the son of the Michelangelo statue worthy Lord of Gym next to da pool[.]"  DCSF at ¶ 22; DCSF Ex. 19 at 1; Oliva Depo. at 112:17–113:12.

On February 14, 2023, Oliva sent Messina another email, suggesting that he had seen Messina at the Kona Macy's while driving a County vehicle and making an "Open Records Request for a copy of the sales receipt of what you bought." DCSF at ¶ 23; RCSF at ¶ 23; DCSF Ex. 20 at 5, Dkt. No. 78-23; Oliva Depo. at 114:4–115:10.  When Messina declined to provide one, Oliva responded by sending a photo of transgender swimmer Lia Thomas and asking, "[w]as the shopping excursion for a Valentine's presentLia [sic] Thomas.  like he/she/it could be a 'daughter' from another life?"  DCSF at ¶ 24; RCSF at ¶ 24; DCSF Ex. 20 at 1–2; Oliva Depo. at 115:11–116:5.  On February 16, 2023, Messina replied by informing Oliva that his communications were inappropriate and harassing, and that he would "now be seeking input from authorities."  DCSF Ex. 20 at 1; Oliva Depo. at 115:6–15.

The next day, February 17, 2023, Oliva emailed Messina, calling him a "crybully" and suggesting that "[i]nstead of shopping jaunts to Macy's with the Peoples' Ford Explorer," he "spend time on developing a curriculum of sex ed classes for your Aquatics Division staff, so newly hired lifeguards don't get preggos right away - go on maternity leave and inconvenience pool goers with closures due to staff shortages."  DCSF at ¶ 25; RCSF at ¶ 25; DCSF Ex. 21 at 1, Dkt. No. 78-24; Oliva Depo. at 116:19–117:17.  Oliva further stated that while Messina should "[g]o seek that input from the authorities," he shouldn't "forget to tell them that this marks month number 25 that I have been waiting for an Equal Opportunity for SR-13 Lifeguard - one based on a fair and competitive hiring process."  DCSF Ex. 21 at 3; Oliva Depo. at 117:18–19.

Only a few days later, on February 20, 2023,[11] Oliva sent Messina another email which suggested that, "[i]nstead of crybullying about my emails," Messina should "put some thoughts [sic] towards where inappropriateness actually does exist" including with regard to "all the other perjury committing vile crap that spewed out of your filthy mouth!"  DCSF Ex. 22 at 1.  Oliva additionally demanded that Messina "cease and desist your disgusting and pathetic attempts of trying to exert dominance over me and dictate how I may express myself" as "I

---

[11]Although the DCSF states that this email was sent on February 21, 2023, it appears to have actually been sent on February 20, 2023.  *Compare* DCSF at ¶ 26, *with* DCSF Ex. 22 at 1, Dkt. No. 78-25.

WILL NOT LICK YOUR BOOTS!  Call 1-800-LIATHOMAS for that - I hear

he/she/it is a freak like that."  DCSF at ¶ 26; RCSF at ¶ 26; DCSF Ex. 22 at 1.

Oliva concluded by suggesting that "Tyrants and Dictators like you belong in

North Korea not in Hawai'i Nei" and that Messina should be put "in a jail in this

country for abusing your position of power and influence to blatantly violate my

Constitutional Rights and do so with impunity and in collusion with several other

bad actors of the not so skilled lifeguard variety at KCAC."  DCSF Ex. 22 at 2.

On February 23, 2023, in response to Oliva's ongoing conduct, Hawai'i

County Auditor Tyler Benner emailed Messina to express "growing concerns for

your safety" and to suggest that if Messina was "feeling harassed, and haven't

already, perhaps you should document your interactions and/or consult with

authorities."[12]  DCSF at ¶ 27; DCSF Ex. 23 at 1, Dkt. No. 78-26.  Messina

contemplated filing a police report for harassment, but ultimately decided not to do

so.  DCSF Ex. 23 at 1; Messina Decl. at ¶ 45.

---

[12]Oliva specifically objects to this email as lacking foundation because "[t]he proponent of this email has not established its authenticity or relevance be [sic] providing sufficient context about is [sic] creation, intent, or connection to this case."  RCSF at ¶ 27.  As before, each of these objections lacks merit.  *See* Fed. R. Evid. 901(b)(1) (explaining that evidence may be authenticated by testimony of a witness with knowledge that an item is what it is claimed to be); Messina Decl. at ¶¶ 44–46 (explaining the circumstances of the email and certifying that a true and correct copy of the same is attached as Exhibit 23); *JAE Properties, Inc. v. AMTAX Holdings 2001-XX, LLC*, 716 F.Supp.3d 918, 929–30 (S.D. Cal. 2024) (explaining that "relevance and improper legal conclusion objections are moot and duplicative of the summary judgment standard" and therefore will not be independently considered).

Thereafter, on April 3, 2023,[13] Oliva sent Messina and Flores-Morikami an email asking if that was "you Mo getting slapped with a TRO today?" and attaching a screenshot from a court website.  DCSF at ¶ 21; RCSF at ¶ 21; DCSF Ex. 18 at 1–2; Oliva Depo. at 110:23–112:3.  This was followed, on April 18, 2023, by another email to Messina containing a timeline of Oliva's grievances with the commentary that "it wouldn't surprise me if someone would end up calling you an apathetic shitfucker" but "[s]ince I had, and continue to have, the politeness not to resort to such name calling, please have the decency to see to it that I get a long overdue merit based hiring."  DCSF at ¶ 28; RCSF at ¶ 28; DCSF Ex. 24 at 1–2, Dkt. No. 78-27.  Messina responded by informing Oliva that due to his "harassing name calling," Messina would no longer be reading or responding to his emails and would be blocking his email address.  DCSF Ex. 24 at 1.

During this same time period, on March 12, 2023, Oliva applied once again to be hired as a lifeguard at KCAC.  DCSF at ¶ 29; RCSF at ¶ 29; DCSF Ex. 25, Dkt. No. 78-28.  Although he passed a swim assessment, completed a panel interview, and indeed, was the only applicant for the position, Messina nevertheless declined to hire him after receiving the panel's recommendation that the Parks Department:

---

[13]The DCSF states that this email was sent on January 3, 2023.  *See* DCSF at ¶ 21.  Once again, that appears to be a clerical error, as the email itself is date-stamped April 3, 2023.  *See* DCSF Ex. 18, Dkt. No. 78-21.

> not hire Karsten Oliva due to inappropriate behaviors exhibited toward
> current Recreation Division employees, including panel member,
> Alejandra Flores-Morikami and employees at the Kona Community
> Aquatics Center (KCAC).  The immediate supervisor for this position
> contemplated application for a temporary restraining order against Mr.
> Oliva due to his inappropriate behaviors.  Hiring this applicant would
> be detrimental to the current team of employees at KCAC.

DCSF at ¶¶ 30–31; DCSF Ex. 27 at 1, Dkt. No. 78-30; Messina Decl. at ¶¶ 52–

54.[14]  In concurring with the panel's recommendation, Messina noted that "[i]n the

past 2 years, Mr. Oliva has exhibited uncivil, unprofessional, and offensive

behavior that has caused stress and safety concerns to current County employees."

DCSF at ¶ 32; DCSF Ex. 27 at 1; Messina Decl. at ¶ 54.[15]

On June 30, 2023, Oliva was informed that he had, once again, not been

selected for a lifeguard position at KCAC.  Opp. Exs. 10–13, Dkt. Nos. 83-10–83-

13.  In response, Oliva proceeded to send additional harassing emails to Roth,

Messina, Lord, Flores-Morikami, and others.  DCSF at ¶ 33; RCSF at ¶ 33;

Messina Decl. at ¶¶ 58–64, 68–72, 75.  Among other things, in these emails, Oliva

---

[14]Oliva disputes these facts as he purportedly lacks "knowledge that what Messina claim a [sic] to have received is authentic" and the panel's recommendation is "Baseless Conjecture."  RCSF at ¶¶ 30–31.  The recommendation, however, was based on the panel's *opinion* and authenticated by Messina.  *See* DCSF Ex. 27 at 1; Messina Decl. at ¶ 52.

[15]Oliva objects to Messina's statements as hearsay and an "assine [sic] assertion given that four (4) county employees, including Parks & Rec Deputy Director Michelle Hiraishi all sat in a room together with the Plaintiff during his approximately one hour-long interview on June 9, 2023 and we all got along nicely."  RCSF at ¶ 32.  Once again, this statement is not hearsay as it is not being offered for the truth of the matter asserted, but rather for its effect on Messina's hiring decisions.  *See* Fed. R. Evid. 801(c)(2).  Moreover, whether or not Oliva believes the statement to be "asinine" has no bearing on its admissibility.

critiqued a wedding video posted to Flores-Morikami's personal Facebook page (where she is not "friends" with Oliva); called Flores-Morikami a "crybully," "fake," "pretender," "wearer of a mask," "coverup artist," and "a liar;"[16] suggested that "MO NEEDS TO GO" because Messina is a "scumbag," a "sociopath," "morally decrepit[]," "partakes in the consumption of mind altering drugs," is an "overpaid pathological liar," and "a morally defunct hack;" and remarked that "the great Nepotist Victor McDaniel (The David) . . . operates with the same level of incompetence . . . [as] the Mighty Mo does."  DCSF at ¶ 33; RCSF at ¶ 33; Messina Decl. at ¶¶ 58–64, 68–70; DCSF Ex. 28 at 1–2, Dkt. No. 78-31; DCSF Ex. 29 at 2; DCSF Ex. 30 at 1, Dkt. No. 78-33; DCSF Ex. 31 at 1, Dkt. No. 78-34; DCSF Ex. 32 at 1, Dkt. No. 78-35; DCSF Ex. 36 at 3, Dkt. No. 78-39; DCSF Ex. 37 at 1, Dkt. No. 78-40.

On August 16, 2023, Oliva filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), asserting that the Parks Department's decision not to hire him on June 30, 2023 constituted unlawful discrimination on the basis of age and national origin.  DCSF at ¶ 34; RCSF at ¶ 34; DCSF Ex. 33 at 1, Dkt. No. 78-36.  Eight days later, on August 24, 2023,

---

[16]The DCSF states that this email was sent to Deputy Director of Parks Michelle Hiraishi.  *See* DCSF at ¶ 33.  This again appears to be a clerical error as that email was actually sent to Flores-Morikami.  *See* RCSF at ¶ 33 (denying that Oliva called Hiraishi those names); DCSF Ex. 29 at 2; Messina Decl. at ¶ 59.

Oliva filed an Amended Charge of Discrimination.[17]  DCSF at ¶ 35; RCSF at ¶ 35;

DCSF Ex. 34 at 1.  On August 31, 2023, the EEOC declined to further proceed

with its investigation and issued a notice of right to sue.  DCSF at ¶ 36; RCSF at

¶ 36; DCSF Ex. 35 at 1, Dkt. No. 78-38.

Thereafter, on November 24, 2023, Oliva filed the instant lawsuit against the

Parks Department, Messina, Roth, Lord, and McDaniel, alleging: (1)

discrimination and retaliation based on national origin in violation of Title VII; (2)

discrimination and retaliation based on age in violation of the ADEA; (3) violation

of 18 U.S.C. § 241; (4) violation of 18 U.S.C. § 242; (5) failure to supervise; (6)

defamation; and (7) blacklisting.[18]  Compl. at ¶¶ 2–6, 76–102.

On November 21, 2024, Defendants filed the instant motion for summary

judgment, Dkt. No. 77, along with their concise statement of facts, Dkt. No. 78.

On December 20, 2024, Oliva filed a brief in opposition, Dkt. No. 83, and a

response to Defendants' concise statement of facts, Dkt. No. 84.  On December 27,

2024, Defendants filed a reply.  Dkt. No. 87.  Pursuant to Local Rule 7.1(c), the

Court elected to decide this motion without a hearing, *see* Dkt. No. 88, and this

Order now follows.

---

[17]The two charges differ only in the respect that the amended charge adds the Hawaiʻi Civil
Rights Commission ("HCRC") as the relevant state or local agency.  *See* RCSF at ¶ 35; DCSF
Ex. 33 at 1; DCSF Ex. 34 at 1, Dkt. No. 78-37.
[18]Oliva has continued to send emails to County employees, even after initiating the instant suit.
*See, e.g.*, DCSF Ex. 39 at 2–3, Dkt. No. 78-42 (attaching photos of Messina at KCAC); DCSF
Ex. 40 at 2, Dkt. No. 78-43 (attaching a photo of a KCAC lifeguard).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Where, as here, "the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *In re Oracle Corps. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial."  *Id.*  In assessing a motion for summary judgment, all facts are construed in the light most favorable to the non-moving party.  *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

## DISCUSSION

Defendants move for summary judgment on all claims, arguing, *inter alia*, that Oliva: (1) failed to exhaust his administrative remedies with respect to certain aspects of his Title VII and ADEA claims; (2) cannot show that Defendants' proffered reasons for refusing to hire him were pretext for unlawful discrimination; (3) lacks a private right of action to assert his criminal claims; (4) failed to provide the requisite notice for his state law tort claims; and (5) cannot bring a blacklisting claim under Hawaiʻi Revised Statutes ("HRS") Section 377-6 against the County

of Hawaiʻi.  *See generally* Dkt. No. 77-1.  The Court addresses each of these

arguments in turn.

## I.      Counts One and Two: Title VII and ADEA Exhaustion

In Counts I and II, Oliva brings claims against the Parks Department for

subjecting him to discrimination and retaliation on the basis of his age and national

origin by "intimidating him, subjecting him to a hostile public recreation

environment, [and] denying him [] a fair hiring process and employment," in

violation of Title VII and the ADEA.  *See* Compl. at ¶¶ at 76–87.

Prior to bringing a claim under either Title VII or the ADEA in federal court,

a non-federal employee must first timely exhaust his administrative remedies with

the EEOC and/or the HCRC.  *See B.K.B. v. Maui Police Dep't*, 276 F.3d 1091,

1099 (9th Cir. 2002), *abrogated on other grounds by Fort Bend Cnty., Texas v.

Davis*, 587 U.S. 541 (2019); *You v. Longs Drugs Stores California, LLC*, 937

F.Supp.2d 1237, 1248 (D. Haw. 2013).  Timely exhaustion means the "plaintiff

must [have] file[d] a charge with the EEOC within 300 days of the last alleged

unlawful employment practice, and then the plaintiff must institute his or her

action within ninety days from when the EEOC issues a right to sue letter."[19]  *See

Lee v. Comprehensive Health Mgmt.*, 2020 WL 4810108, at *1 (D. Haw. Aug. 18,

---

[19]Hawaiʻi is a "worksharing" jurisdiction and therefore, charges filed with the EEOC are deemed
to be dual-filed with the HCRC such that the 300-day limit applies.  *See United States EEOC v.
Global Horizons, Inc.*, 904 F.Supp.2d 1074, 1090 n.2 (D. Haw. 2012).

2020); 42 U.S.C. § 2000e-5(e)(1) & (f)(1); 29 U.S.C. § 626(d)(1) & (e).

The exhaustion requirement has a dual purpose—first, it "give[s] the charged party notice of the claim," and second, "it narrow[s] the issues for prompt adjudication and decision." *B.K.B.*, 276 F.3d at 1099 (quotation marks and citations omitted). As such, the "scope of a [] claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation." *Id.* at 1100 (quotation marks and citation omitted). Although "[t]he specific claims made in district court ordinarily must be presented to the EEOC," the court may also hear "any charges . . . that are 'like or reasonably related to' the allegations made before the EEOC, as well as charges that are within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations." *Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003). In making a determination as to "whether a plaintiff has exhausted allegations that she did not specify in her administrative charge," the court may consider factors including:

> the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, [] any locations at which discrimination is alleged to have occurred . . . [and] the extent that [plaintiff's] claims are consistent with the plaintiff's original theory of the case.

*B.K.B.*, 276 F.3d at 1100.

Here, Oliva filed an EEOC charge on August 16, 2023, followed by an amended charge on August 24, 2023. *See* DCSF Ex. 33 at 1; DCSF Ex. 34 at 1.

These charges allege, in their *entirety*, that:

> I applied and interviewed for four open Pool Lifeguard SR-13 positions
> with the County of Hawaiʻis [sic] Department of Parks and Recreation
> and received four non-selection notices on *June 30, 2023*. In response
> to my non-selection, I submitted an Open Records Request based on
> the Uniform Information Practices Act (UIPA). The County of
> Hawaiʻis [sic] Department of Parks and Recreation processed the
> request and subsequently notified me on July 20, 2023, There were no
> other applicants for the positions.
>
> I believe that I have been *discriminated* against because of my national
> origin (German), in violation of Title VII of the Civil Rights Act of
> 1964, as amended and because of my age (over 40 y/o), in violation of
> the Age Discrimination in Employment Act of 1967, as amended.

*Id.* (emphases added). As is plainly evident, although Oliva's EEOC charges raise

complaints of age and national origin discrimination related to his June 30, 2023

non-selection, they make *no* mention whatsoever of retaliation or of discrimination

occurring prior to that date.

Moreover, even when construed with liberality, there is no indication that

Oliva's retaliation claims or pre-June 30, 2023 discrimination claims are "like or

reasonably related" to the allegations he presented to the EEOC or could have

reasonably been expected to grow out of the EEOC's investigation of the same.

*See Leong*, 347 F.3d at 1122; *B.K.B.*, 276 F.3d at 1100. For instance, although

Oliva devotes several pages of his Complaint to the purported retaliation he

experienced for complaining about being "sidelined" in 2020, *see* Compl. at ¶¶ 28–

75, such allegations are factually divorced from Oliva's original theory of the

case—that is, age and national origin discrimination based on the Parks

Department's refusal to hire him as a lifeguard on June 30, 2023. *See B.K.B.*, 276

F.3d at 1100; DCSF Ex. 33 at 1; DCSF Ex. 34 at 1. Similarly, with respect to the

pre-June 30, 2023 discrimination claims, each of the allegedly discriminatory acts

was a discrete incident which occurred *years* prior to the June 30, 2023 date

specified in the charges.[20] *See* Compl. at ¶¶ 17–27; *Nat'l R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101, 114 (2002). As such, given the sparse allegations in the

EEOC charges, there is no indication that either the EEOC or the Parks

Department should have been on notice of the retaliation and pre-June 30, 2023

discrimination charges that Oliva now brings.[21] *See EEOC v. Farmer Bros. Co.*,

31 F.3d 891, 899 (9th Cir. 1994); *see also Curry v. Shinseki*, 356 F. App'x 983,

984–85 (9th Cir. 2009) (finding that the EEOC was not on notice to investigate

racial discrimination claims or past instances of retaliation where the plaintiff's

charge identified only a single incident of retaliation). Oliva has therefore failed to

properly exhaust his administrative remedies, and the Court GRANTS summary

judgment to the Parks Department on Counts I and II insofar as they allege: (1)

retaliation on the basis of age and national origin; and (2) discrimination on the

---

[20]It is perhaps for this reason that although Oliva argues that his present claims are "reasonably related" to the allegations in his EEOC charges, he makes no attempt to explain *how*. *See* Opp. at 10.

[21]Of course, it is also notable that despite amending his EEOC charge, Oliva failed to add *any* allegations related to retaliation or events prior to June 30, 2023. *See* DCSF Ex. 34 at 1; *Leong*, 347 F.3d at 1122.

basis of age and national origin prior to June 30, 2023.[22]

## II.    Counts One and Two: Title VII and ADEA Merits

This leaves Oliva's claims of discrimination on the basis of age and national origin as it relates to the June 30, 2023 non-selection. *See* Compl. at ¶¶ 76–87. The Court therefore turns to addressing these claims on the merits.

### A.    Title VII/ADEA Framework

The Court "combine[s] the Title VII and ADEA claims for analysis because the burdens of proof and persuasion are the same." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 888–89 (9th Cir. 1994).   Pursuant to both statutes, where, as here, the plaintiff lacks direct evidence of discrimination,[23] he may instead "prove his case through circumstantial evidence, following the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002); *accord Shelley v. Geren*, 666 F.3d 599, 607–08 (9th Cir. 2012).

Under the *McDonnell Douglas* framework, the burden first lies with the

---

[22]Moreover, at this point, any attempt to bring EEOC charges on those allegations would be time-barred.  *See Morgan*, 523 U.S. at 113–14 (finding that because the "continuing violations doctrine" does not apply to a series of "separate actionable 'unlawful employment practices,'" an EEOC charge "must be filed within the 180- or 300-day period after the discrete discriminatory act occurred.").

[23]"Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Coghlan v. American Seafoods Co. LLC.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (quotation marks, brackets, and citation omitted).  Usually, it "consists of clearly . . . discriminatory statements or actions by the employer." *Id.*

plaintiff to establish a *prima facie* case of disparate treatment through "evidence
that gives rise to an inference of unlawful discrimination." *Lyons*, 307 F.3d at
1112 (quotation marks, brackets, and citations omitted). To do so, the plaintiff
must show: "(1) he belongs to a statutorily protected class, (2) he applied for and
was qualified for an available position, (3) he was rejected despite his
qualifications, and (4) after the rejection, the position remained available and the
employer continued to review applicants possessing comparable qualifications."
*Id.* (citing *McDonnell Douglas*, 411 U.S. at 802); *accord Cotton v. City of
Alameda*, 812 F.2d 1245, 1248 (9th Cir. 1987) (ADEA); *Fragante v. City & Cnty.
of Honolulu*, 888 F.2d 591, 595 (9th Cir. 1989) (national origin).

"Once established, the *prima facie* case creates a rebuttable presumption that
the employer unlawfully discriminated against the employee." *Lyons*, 307 F.3d at
1112 (quotation marks and citations omitted). The "burden of production" then
shifts to the defendant-employer at the second step to "clearly set forth, through the
introduction of admissible evidence" a "legitimate, non-discriminatory reason for
the plaintiff's rejection." *See Lyons,* 307 F.3d at 1112 (quotation marks and
citations omitted).

If the employer does so, the burden finally shifts one last time back to the
plaintiff to "raise a triable issue of material fact as to whether the defendant's
proffered reasons . . . are mere pretext for unlawful discrimination." *Hawn v.*

*Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155–56 (9th Cir. 2010).  The plaintiff may

do so "(1) indirectly, by showing that the employer's proffered explanation is

unworthy of credence because it is internally inconsistent or otherwise not

believable, or (2) directly, by showing that unlawful discrimination more likely

motivated the employer." *Lyons,* 307 F.3d at 1113 (quotation marks and citations

omitted).  "If a rational trier of fact could, on all the evidence, find that the

employer's action was taken for impermissibly discriminatory reasons, summary

judgment for the defense is inappropriate." *Wallis*, 26 F.3d at 889.

Notably, "[a]lthough intermediate evidentiary burdens shift back and forth

under this framework, the ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with

the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143

(2000) (quotation marks, bracket, and citation omitted).

**B.   <u>Analysis</u>**

Here, the Parks Department does not contest whether Oliva has met his

initial burden of establishing a *prima facie* case of discrimination on the basis of

age and national origin.  *See* Dkt. No. 77-1 at 10.  Nevertheless, it argues that even

in the light most favorable to Oliva, there were legitimate, non-discriminatory

reasons why he was not selected as a lifeguard—namely, that his years of near-

constant harassing communications and interactions with Parks Department

employees and others indicated that he lacked the proper temperament to be a
County lifeguard. *See id.* at 10–17.

The Court agrees. The Parks Department has produced an enormous volume
of emails, reports, and other evidence, which show that for over two years, Oliva
engaged in an ongoing campaign to harass and abuse other patrons at KCAC and
the very Parks Department staff with whom he hoped to work. For example,
among other things, between February 2021 and June 2023, Oliva sent emails:

- To Messina and Roth, asking Messina to look into his allegations of
  hiring irregularities "with a little more veracity." DCSF Ex. 4 at 3.

- To Messina, criticizing a misspelled sign at KCAC as "[p]athetic!"
  and indicating that "[a]t KCAC mediocrity [loves] company."
  DCSF Ex. 5 at 1–2.

- To Roth, Lord, and Messina, criticizing the way that lifeguard
  Delovio wore her face mask and suggesting that she was hired as a
  "perk[] of nepotism." DCSF Ex. 6 at 1.

- To Roth, Lord, and Messina, suggesting that the County erect a
  statue "[l]ike Michaelangelo's [sic] David, but retaining the essence
  of [McDaniel's] smugness that the people's pool exists to serve up
  jobs for his family members without having to compete with
  outsiders like me" and attaching a photo edited to superimpose
  McDaniel's face onto the statue of David. DCSF Ex. 7 at 3.

- To Roth, Lord, and Messina with a graphic stating: "You can fool
  all ~~the people~~ average swimmers some of the time, and some of the
  ~~people~~ weak swimmers all the time, but you cannot fool all the
  ~~people all the time~~ fast swimmers @ any time. – ~~Abraham Lincoln~~
  Unemployed Lifeguard." DCSF Ex. 8 at 3.

- 25 -

- To Roth, Lord, and Messina, "congratulat[ing] Parks and Recreation for the outstanding efforts being made under your leadership to solve the Big Island's homeless problem" and commenting that it was "[h]eartwarming to see such Aloha being showered upon tweekers and other assorted riff raff, while I myself, as a lifeguard salary deprived and unjustly trespass noticed swimmer, unassumingly take up residence in a 4-door sedan without trashing my surroundings or otherwise make myself a visual plight to our lovely community." DCSF Ex. 14 at 1.

- To Messina and Flores-Morikami, suggesting that the Parks Department chose not to have a "functional video surveillance system" as it "might even capture imagery of a roly-poly lifeguard getting impregnated just a few month [sic] after getting the job" and attaching a social media photo of Delovio as proof of "what entitlement looks like[.]" DCSF Ex. 15 at 1–2.

- To Messina, complaining about a lifeguard's worn tires, suggesting that Delovio was parked incorrectly, remarking that "[i]f the little Prima-Donna doesn't like waddling a few extra feet, maybe a red carpet will entice her," attaching photos of the cars and Delovio, and asking Messina whether he had "an ounce of shame to be at the helm of this shitshow?" DCSF Ex. 17 at 2–7.

- To Messina, calling him "Your Majesty, Exalted Ruler Of The Kingdom of Parks & Recreation," and asking whether "actual merit in the water and a degree from the University of California, and AARP eligible age [are] still disqualifying factors" for the Parks Department's posted lifeguard vacancies  or whether "preference [will] once again be given to young roly-polly [sic] females who fornicate with the son of the Michelangelo statue worthy Lord of Gym next to da pool?" DCSF Ex. 19 at 1.

- To Messina, suggesting that Oliva had seen him at the Kona Macy's driving a County vehicle and making an Open Records Request to obtain a copy of the sales receipt for his purchases.  DCSF Ex. 20 at 3–5.

- In reply to Messina, attaching a photo of transgender swimmer Lia Thomas, and asking whether his Macy's purchase was "for a Valentine's presentLia [sic] Thomas. like he/she/it could be a 'daughter' from another life?"  *Id.* at 1.

- To Messina, calling him a "crybully" and asking that "[i]nstead of shopping jaunts to Macy's with the Peoples' Ford Explorer," that he "[j]ust once, do something that is actually productive" such as "developing a curriculum of sex ed classes for your Aquatics Division staff, so newly hired lifeguards don't get preggos right away - go on maternity leave and inconvenience pool goers with closures due to staff shortages."  DCSF Ex. 21 at 1.

- To Messina, suggesting that he "belong[ed] in North Korea" or a "jail in this Country" and that "[i]nstead of crybullying about my emails," he should "put some thoughts [sic] towards where inappropriateness actually does exist" including with regard to "all the other perjury committing vile crap that spewed out of your filthy mouth[,]" and "cease and desist your disgusting and pathetic attempts of trying to exert dominance over me and dictate how I may express myself" as "I WILL NOT LICK YOUR BOOTS!  Call 1-800-LIATHOMAS for that - I hear he/she/it is a freak like that."  DCSF Ex. 22 at 1–2.

- To Messina and Flores-Morikami, asking if that was "you Mo getting slapped with a TRO today?" and attaching a screenshot from a court website.  DCSF Ex. 18 at 1–2.

- To Messina, stating that "it wouldn't surprise me if someone would end up calling you an apathetic shitfucker" and asking him to "have the decency to see to it that I get a long overdue merit based hiring."

DCSF Ex. 24 at 2.

Moreover, during this same time period, Messina also received reports that:

- Oliva had acted in an unsettling manner towards Ashlynn
  Kaiamakini—a KCAC lifeguard—by making eye contact with her
  in the parking lot of a Walmart, driving towards her, passing slowly
  in front of her vehicle, making eye contact again, and speeding off.
  DCSF Ex. 41 at 1.

- Oliva had been engaging in "unwarranted and very disturbing"
  "harassment and intimidation" towards a KCAC patron by
  "staring/glaring at [his] son and [him] continuously" for a month and
  "intentionally splash[ing] other swimmers and the lifeguards"
  despite having been previously warned about this and other
  behavior.  DCSF Ex. 9 at 1; Messina Decl. at ¶ 27.

As could not be more evident from these emails and interactions, the Parks

Department had legitimate, non-discriminatory reasons for refusing to hire Oliva—

that is, that Messina and the members of the hiring panel rationally believed, based

on their personal experiences, that Oliva lacked the necessary temperament for a

lifeguard given his apparent inability to treat prospective patrons, co-workers, and

supervisors with even the most basic civility and respect.[24]  *See* DCSF Ex. 27

(recommending that Oliva not be hired "due to inappropriate behaviors exhibited

towards current Recreation Division employees, including panel member

Alejandra Flores-Morikami and employees at the Kona Community Aquatics

---

[24]It is also notable that Oliva continued to send harassing, profane, and disparaging emails to
Roth, Messina, Flores-Morikami, and others well beyond his June 30, 2023 non-selection.  *See*
DCSF Exs. 28–32, 36–37, 39–40.

Center" and approving the recommendation based on Oliva's "uncivil,
unprofessional, and offensive behavior that has caused stress and safety concerns
to current County employees").  Put differently, despite his swimming ability,
educational background, and the fact that he was the only applicant for the
position, the Parks Department declined to hire Oliva because he simply did not
meet the minimum requirements for the position.  *See* Messina Decl. at ¶¶ 51, 53–
56; *see also* DCSF Ex. 26 at 4, Dkt. No. 78-29 (listing the ability to "deal tactfully
and effectively with the public" as a minimum qualification requirement).  As
such, the Parks Department has met its burden at Step Two of the *McDonnell
Douglas* framework.

        The burden therefore shifts to Oliva to show the Parks Department's
proffered reasons were, in reality, mere pretext for unlawful discrimination based
on age and national origin.  *See Raad v. Fairbanks North Star Borough Sch. Dist.*,
323 F.3d 1185, 1193–95 (9th Cir. 2003); *Shelley*, 666 F.3d at 608.  However, Oliva
has not presented *any* evidence—whether direct or circumstantial—which might
support such a finding.  In fact, Oliva does not point to a *single* remark, reference,
incident, policy, statistic, or anything else, other than his own speculation, which
could be in any way construed to indicate that the Parks Department intended to
discriminate on the basis of his age and/or national origin.  *See generally* Opp. &
RCSF; *see also Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)

(explaining that even circumstantial evidence of pretext "must be 'specific' and 'substantial in order to create a triable issue with respect to whether the employer intended to discriminate."). Instead, Oliva complains that summary judgment is inappropriate because Defendants' evidence is "cherry-picked," lacks proper authentication, is incomplete and ambiguous, conflicts with "other evidence such as 911 calls [and] police body cam videos[,]" or otherwise requires the Court to weigh credibility or factual disputes. *See* Opp. at 11–14.

But each of these arguments lacks merit. First, as the Court has already explained several times over, *see, e.g.*, *supra* 3–4 n.3 & n.4, Defendants' proffered evidence is neither improperly authenticated nor incomplete such that it would be inadmissible. Moreover, although Oliva vaguely asserts that his emails conflict with other evidence, he has failed to provide *any* such evidence or explain precisely *how* it would be contradictory to the emails. *See* Opp. at 13. No "911 calls" or "police body cam videos," for example, have been offered. And finally, despite Oliva's assertions that "[t]he interpretation of the email content hinges on witness testimony" because they "contain sarcasm[,]" "rhetorical hyperbole[,]" "the linguistic style of someone who grew up in Germany[,]" and "vague or unclear statements that require explanation[,]" he neither offers what that witness testimony would be, nor does the Court need more witness testimony to determine that which is facially apparent—*i.e.*, that Oliva's emails are derogatory, profane,

and harassing attacks on the Parks Department, its staff, and other County

employees, which, alone, justify the Parks Department's decision not to hire him.

*See id.*; *see generally* DCSF Exs. 4–8, 14–15, 17–22, 24.

As such, in the absence of *any* evidence to the contrary,[25] the Court finds

that Oliva has failed to meet his burden of establishing that the Parks Department's

reasons for declining to hire him were somehow pretext for discrimination.  The

Parks Department's motion for summary judgment is therefore GRANTED as to

Counts I and II insofar as they allege unlawful age and national origin

discrimination under the ADEA and Title VII with respect to the June 30, 2023

non-selection.

## III.    <u>Counts Three and Four: 18 U.S.C. §§ 241 & 242</u>

Oliva asserts in Counts III and IV that the Parks Department's actions

constituted an unlawful conspiracy to deprive him of his rights, in violation of Title

18 of the United States Code, Sections 241 and 242.  Compl. at ¶¶ 88–95.  These

statutes, however, are *criminal* provisions which do not give rise to a private cause

of action or civil liability.  *See Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir.

---

[25]In his opposition, Oliva also attaches character references from Cathleen Gabriele, a retired
KCAC lifeguard, Julie Parrish, a regular KCAC patron, and Lynne Wesley, a Konawaena pool
patron, as evidence that he has the skills and temperament to be a County lifeguard.  *See* Opp. at
12–14; Opp. Exs. 14–16, Dkt. Nos. 83-14–83-16.  The mere fact, however, that these persons
believe he should be hired as a lifeguard has little relationship to whether the Parks Department's
proffered reasons were pretextual, particularly given Messina and the hiring panel's *own*
experiences with Oliva and the apparent ignorance of these witnesses insofar as Oliva's 2021
through 2023 course of conduct is concerned.

1980).  Standing to initiate criminal investigations or prosecutions lies exclusively

with the United States Department of Justice—not the Court and not private

citizens.  *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("a private citizen

lacks a judicially cognizable interest in the prosecution or nonprosecution of

another.").  As a result, because Oliva has no right as a private individual to bring

criminal charges under either Section 241 or Section 242, the Parks Department is

entitled to summary judgment on Counts III and IV.

## IV.    Counts Five and Six: Failure to Supervise & Defamation

In Counts V and VI, Oliva brings state law tort claims for failure to

supervise and defamation based on Defendants' "repeated and grossly negligent

failures" to supervise Parks Department employees and the "many slanderous and

libelous ways in which [Oliva's] good character was repeatedly defamed," both of

which caused Oliva to suffer "humiliation, degradation, emotional distress, [and]

other consequential damages."[26]  *See* Compl. at ¶¶ 96–99.

Pursuant to Hawaiʻi state law and the Hawaiʻi County Charter ("HCC"), a

plaintiff bringing a tort claim against the County[27] must first provide notice in

---

[26]Although Count V (failure to supervise) is asserted against Defendants Roth, Lord, and
Messina, it is unclear against whom precisely Oliva asserts Count VI (defamation).  *See* Compl.
at ¶¶ 96–99.
[27]This includes, as here, claims brought against County employees in their official capacities.
*See White v. Cnty. of Hawaii*, 2021 WL 4504679, at *2 (D. Haw. Oct. 1, 2021); Compl. at ¶¶ 3–
6.

writing of the alleged injury and the damages claimed.  Specifically, HRS § 46-72

states:

> Before the county shall be liable for damages to any person for injuries
> to person or property received upon any of the streets, avenues, alleys,
> sidewalks, or other public places of the county, or on account of any
> negligence of any official or employee of the county, the person injured,
> or the owner or person entitled to the possession, occupation, or use of
> the property injured, or someone on the person's behalf, within two
> years after the injuries accrued shall give the individual identified in the
> respective county's charter, or if none is specified, the chairperson of
> the council of the county or the clerk of the county in which the injuries
> occurred, notice in writing of the injuries and the specific damages
> resulting, stating fully when, where, and how the injuries or damage
> occurred, the extent of the injuries or damages, and the amount claimed.

HCC § 13-18 similarly provides:

> No action shall be maintained for the recovery of damages for any
> injury to persons or property by reason of negligence or other act of any
> official or employee of the county unless a written statement stating
> fully when, where and how the injuries occurred, the apparent extent
> thereof and the tentative amount claimed therefor shall have been filed
> with the county clerk within two years after the date the injury was
> sustained.

Here, there is no dispute that Oliva never provided the written notice to the

Hawaiʻi County Clerk that both HRS § 46-72 and HCC § 13-18 require.  *See* Decl.

of Jon Henricks at ¶¶ 2, 5, Dkt. No. 78-3; DCSF at ¶ 37; RCSF at ¶ 37; Opp. at 10.

Rather, Oliva argues that he "was not statutorily required to provide notice of his

claims to the Hawaiʻi County Clerk" because "plaintiffs pursuing federal

discrimination claims need only exhaust federal administrative remedies."  Opp. at

10.  This argument ignores, however, that notice under HRS § 46-72 and HCC

- 33 -

§ 13-18 is required for *state law* tort claims—including Oliva's claims of

defamation and negligent supervision.[28]  *See Dural v. City & Cnty. of Honolulu*,

658 F.Supp.3d 855, 873 (D. Haw. 2023) (defamation); *Burton v. City & Cnty. of

Honolulu*, 2020 WL 5735128, at *4–6 (negligent supervision).  As such, because

Oliva has failed to comply with his notice of claim obligations, Defendants'

motion for summary judgment is GRANTED with respect to Counts V and VI.

## V.    <u>Count Seven: Blacklisting</u>

Finally, Oliva brings a claim of unlawful "blacklisting" pursuant to

HRS § 377-6, alleging that Defendants "ma[de], circulate[d], or cause[d] to be

circulated a blacklist" against his hiring which "was and is an affront on [Oliva's]

good character and caused him humiliation, degradation, emotional distress, lost

wages, opportunity costs, [and] other consequential damages."  *See* Compl. at

¶¶ 100–02; Karsten Oliva's Resp. to Defs' Interrog. at ¶ 26, Dkt. No. 78-46.

HRS § 377-6(11) provides that "[i]t shall be an unfair labor practice for an

employer individually or in concert with others to . . . [m]ake, circulate, or cause to

be circulated a blacklist."  That statute, however, applies *only* to "employers"—a

category of persons which explicitly *excludes* "the State or any political

---

[28]Although Oliva brings claims sounding in both negligence (failure to supervise) and intentional
conduct (defamation), "the state notice provisions apply to claims based upon negligence as well
as those based upon intentional conduct[.]"  *See Nakamoto v. Cnty. of Hawaiʻi*, 2018 WL
2750224, at *3–4 (D. Haw. June 7, 2018).

subdivision thereof."  HRS § 377-1 (emphasis added).  Put differently, because Oliva brings his "blacklisting" claim against the Parks Department and its employees—all of whom are members of a "political subdivision" of the State of Hawai'i—HRS § 377-6(11) is facially inapplicable.  *See* Haw. Const. art. VIII, § 1. Oliva's claim for "blacklisting" therefore fails as a matter of law, and the Court GRANTS summary judgment to Defendants on Count VII.[29]

## CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment, Dkt. No. 77, is GRANTED.  The Clerk of Court is directed to enter Judgment in favor of Defendants County of Hawai'i Department of Parks & Recreation, Maurice Messina, Mitch Roth, Lee Lord, and Victor McDaniel, and then to CLOSE this case.

IT IS SO ORDERED.

DATED: March 19, 2025 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

---

[29]It is unclear whether "blacklisting" in violation of HRS § 377-6(11) is an independently actionable tort under Hawai'i state law.  *See, e.g.*, *Mathewson v. Aloha Airlines, Inc.*, 919 P.2d 969, 976–77, 988 (Haw. 1996) (noting by way of background that a mediator had found "blacklisting" in violation of Section 377-6 to be a basis for a *Parnar* tort claim for "discharge in violation of public policy").  Although the Court need not—and does not—resolve that issue here, to the extent that it is, this claim would be additionally barred by Oliva's failure to give notice, as required by HRS § 46-72 and HCC § 13-18.  *See supra* 32–34.